529 F.2d 181
 8 ERC 1511, 6 Envtl. L. Rep. 20,432
 RESERVE MINING COMPANY et al., Petitioners,
v.
Honorable Miles W. LORD, Judge, United States District
Court, District of Minnesota, Respondent.
CITY OF DULUTH, Appellee,
v.
RESERVE MINING COMPANY, Appellant.
 Nos. 75--1867, 75--1942.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 18, 1975.
Decided Jan. 6, 1976.
 
 1
 Wayne Johnson, Johnson & Thomas, Silver Bay, Minn., made argument for intervenor, Silver Bay.
 
 
 2
 Byron E. Starns, Chief Deputy Atty. Gen. for the State of Minnesota, St. Paul, Minn., made argument for the State of Minnesota.
 
 
 3
 Edmund B. Clark, Chief, App. Section, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., made argument for Dept. of Justice.
 
 
 4
 Robert McConnell, Asst. Atty. Gen., Madison, Wis., made argument for the State of Wisconsin.
 
 
 5
 Dan Berglund, Duluth, Minn., was permitted to make statement before the Court.
 
 
 6
 Miles W. Lord, United States District Judge, United States District Court for the District of Minnesota was permitted to make a statement before the Court.
 
 
 7
 Opinion of the Court by Circuit Judge LAY, Circuit Judge BRIGHT, Circuit Judge ROSS, Circuit Judge STEPHENSON, Circuit Judge WEBSTER and Circuit Judge HENLEY.
 
 
 8
 This court's prior opinion recites the long and difficult history of this case. Reserve Mining Co. v. Environmental Protection Agency, 514 F.2d 492 (8th Cir. 1975). The matter now comes to us on a petition for mandamus seeking to enjoin the district judge, the Honorable Miles Lord, from interference with state administrative hearings. Petitioners also seek to recuse the district judge from further proceedings in this case. Reserve has separately appealed an order of the district court requiring Reserve to deposit $100,000 into the custody of the City of Duluth so that that entity could provide water filtration. On November 20, 1975 a panel of this court stayed all proceedings in the district court and ordered the Army Corps of Engineers to continue to supervise the water filtration. In view of the serious questions raised in the petition for mandamus the panel referred the matter to this court en banc.
 
 
 9
 This court's earlier judgment recognized that Reserve by its discharge of taconite tailings was polluting both the air in and about Silver Bay, Minnesota and the water of Lake Superior. We said then that Reserve's discharges do pose a danger to the public health. 514 F.2d at 535. Our examination of the record showed, however, only speculative and conjectural evidence of an imminent health hazard from the discharges into the water. We recognized that water filtration would have to continue for many years notwithstanding cessation of the discharge. Balancing the important public interests involved, this court reversed the judgment of the district court closing Reverve's plant. We required immediate filtration of drinking water in Duluth and other North Shore communities. We ordered immediate measures to reduce both air and water pollution, and complete abatement within a reasonable time. We also took note of Reserve's commitment to complete abatement procedures within approximately three years after approval by the State of Minnesota of a tailings disposal site. As we recognized in our order of April 8, 1975, 'the initiation of this timetable in part now depends upon action yet to be taken by the State of Minnesota on Reserve's application for a disposal site.' 514 F.2d at 541, n. 1. All parties immediately set out to fulfill our mandate. No attempt to seek review by petition for certiorari was filed in the Supreme Court.
 
 
 10
 I. Water Filtration.
 
 
 11
 The question of who should supervise water filtration arose before the district court upon motion of the State of Minnesota, joined by Reserve, to require the Corps of Engineers to continue to provide residents of Duluth and surrounding communities with water filtration and supplies of clean drinking water.
 
 
 12
 The Corps urges that under the discretionary authority provided in § 82 of Public Law 93--251, it should be permitted to shift primary responsibility for the filtration program to the local officials.[1]
 
 
 13
 In this court's earlier opinion we observed:
 
 
 14
 Although the United States seeks to appeal the district court's ruling (requiring the Army Corps of Engineers to provide filtered drinking water) . . . at oral argument counsel for the United States informed the court that the Corps of Engineers was complying with the district court's order and would 'continue to do so regardless of the outcome of this appeal * * *.'
 
 
 15
 514 F.2d at 534.
 
 
 16
 We said also that the district court should oversee this process:
 
 
 17
 Additionally, the district court should take proper steps to ensure that filtered water remains available in affected communities to the same extent as is now provided by the Corps of Engineers, although not necessarily at the expense of the Corps.
 
 
 18
 514 F.2d at 540.
 
 
 19
 Thereafter, the Corps did attempt to carry out these orders. The record shows, however, that filtration has thus far been inadequate. Filters have not been inspected properly, some have broken down, and with increased turbidity due to early winter storms, the asbestos fiber count in the drinking water has increased.
 
 
 20
 We reopen our previous mandate and now modify our original order in the following respects:
 
 
 21
 We direct the Corps of Engineers to adequately filter drinking water and furnish safe drinking water for the relevant communities on the North Shore of Minnesota. We find the Corps to be the most efficient and responsible unit to provide filtration and inspection of filtering equipment. We direct continuance of filtration, supervision of filtering units and supply of bottled water until construction of permanent facilities has been completed. The filtration program and supplies should meet the reasonable needs of the communities. At the same time the Corps of Engineers should seek consultation and advice from the National Water Control Laboratory, the St. Louis County Health Department and other local governmental units.[2]
 
 
 22
 We recognize the responsibility of the local governments to cooperate fully with the United States in providing a safe supply of drinking water. We believe this responsibility, however, does not now justify transfer to the local governments of the duty of filtration supervision, which was assumed by the United States under court order rather than by statute. Factors requiring continued supervision by the United States are: (1) that Lake Superior is a body of water under federal jurisdiction; (2) that the pollution affects several states and the health of their inhabitants; (3) that the United States originally entered this controversy to petition for abatement of the nuisance; (4) that the Corps of Engineers and the Environmental Protection Agency's National Water Control Laboratory possess sufficient technical knowledge and equipment; and (5) that the local governmental units may lack expertise, personnel and equipment. These factors justify leaving the primary responsibility with the Corps. Officials of the local governments, however, should be primarily responsible for public education on the pollution dangers and they should continue to cooperate with the United States in determining the needs of the various communities.
 
 
 23
 We assume this program can be administered without further court intervention. However, the abatement of both air and water pollution shall remain within the continuing jurisdiction of the district court.
 
 
 24
 Reimbursement for any expenditures by the United States or the local communities in carrying out the filtration program rests within the jurisdiction of the district court. Upon proper motion and notice by the Corps or governmental units involved, and hearing, the district court shall determine what amounts Reserve must pay for the interim costs of abatement.
 
 
 25
 II. Recusal.
 
 
 26
 A. Denial of Due Process and Judicial Bias.
 
 
 27
 The request for recusal which was made at oral argument in this court arose out of a series of hearings in November, 1975. A hearing on the state's motion to order the Corps of Engineers to continue filtration commenced on November 10 in the district court before Judge Lord. At that time it was the state's position that although the City of Duluth might be able to undertake adequate supervision of water filtration, the smaller communities could not. The district court orally ruled that he would deny the state's motion, but would entertain and sustain a motion to have the City of Duluth filter the water at Reserve's expense.[3] The court then continued the matter until November 14, and as we later discuss, requested officials of the Minnesota Pollution Control Agency to attend that hearing.
 
 
 28
 After the proceedings on November 14, the matter was continued to the following day. On Saturday morning, November 15, after a short proceeding, the court ordered:
 
 
 29
 Reserve Mining Company, as of Monday morning at 10:00 o'clock, shall hand to the City Treasurer of the City of Duluth, a check in the amount of $100,000.00. And there will be no stay on that. That is a firm and final order. That may be appealed, but I do not certify it for appeal because I am not at all in doubt about its propriety.
 
 
 30
 Transcript of November 15, 1975 hearing at 137.
 
 
 31
 Reserve alleged lack of notice and opportunity to be heard, sought a writ of mandamus to enjoin interference with the state proceedings and filed its notice of appeal from the order requiring deposit of $100,000.00.
 
 
 32
 The record reveals that Reserve had no notice of any motion to assess damages against it at the proceedings held on November 10, 14, 15 and 19.[4] Reserve was afforded no opportunity to be heard or to cross-examine any witnesses. For the most part the proceedings constituted a review of the evidence relating to air pollution. The court called witnesses and testified himself. Early in these proceedings the court announced:
 
 
 33
 I have dispensed with the usual adversary proceeding here, because I simply do not have time to spend, as I did, nine months in hearing, six months of which was wasted by what I find now, and did find in my opinions, to be misrepresentations by Reserve Mining Company. Six out of nine months.
 
 
 34
 Transcript of November 14, 1975 hearing at 26.
 
 
 35
 Ordinarily, when unfair judicial procedures result in a denial of due process, this court could simply find error, reverse and remand the matter. Recusal would be altogether inappropriate. However, the record in this case demonstrates more serious problems. The denial of fair procedures here was due not to good faith mistakes of judgment or misapplication of the proper rules of law by the district court. The record demonstrates overt acts by the district judge reflecting great bias against Reserve Mining Company and substantial disregard for the mandate of this court.
 
 
 36
 It is urged that the district court's actions were nothing more than a judge acting upon his deep convictions formed after nine and one-half months of trial. No one can doubt that Judge Lord does have deep convictions in this matter or that such convictions largely influenced his actions. However, the record reveals more than a trial judge merely acting in accord with his prior judgment. In the November proceeding Judge Lord called and examined the witnesses and interspersed testimony of his own; the trial judge announced on the record that witnesses called by Reserve could not be believed, 'that in every instance Reserve Mining Company hid the evidence, misrepresented, delayed and frustrated the ultimate conclusions;' and that he did not have 'any faith' in witnesses to be called by Reserve. Transcript of November 14, 1975 hearing at 2--5, 56, 109. He further announced that the court would have to take depositions since the lawyers opposing Reserve 'did not know anything about it.' Transcript of November 19, 1975 hearing at 25.
 
 
 37
 Judge Lord seems to have shed the robe of the judge and to have assumed the mantle of the advocate. The court thus becomes lawyer, witness and judge in the same proceeding, and abandons the greatest virtue of a fair and conscientious judge--impartiality.
 
 
 38
 A judge best serves the administration of justice by remaining detached from the conflict between the parties. As Justice McKenna stated long ago, '(T) ribunals of the country shall not only be impartial in the controversies submitted to them but shall give assurance that they are impartial . . ..' Berger v. United States, 255 U.S. 22, 35--36, 41 S.Ct. 230, 235, 65 L.Ed. 481 (1921). When the judge joins sides, the public as well as the litigants become overawed, frightened and confused.
 
 
 39
 B. Deliberate Disregard of Appellate Mandate.
 
 
 40
 In our prior opinion, we encouraged the State of Minnesota and Reserve to 'exercise zeal' to arrive at an appropriate on-land disposal site in order to protect public health, to continue employment of several thousand people and to continue production in an important segment of the nation's steel industry. We specifically stated that selection of the land site was not within the federal court's jurisdiction since issuance of permits for land and water discharge was governed by provisions of Minnesota laws. See Minn.Stat.Ann. §§ 116.07(4a); 115.05 (Supp.1974).
 
 
 41
 This court's prior opinion was announced on March 15, 1975. The next day, the district court summoned counsel and referred to our mandate concerning his lack of jurisdiction over on-land disposal by saying that he considered it dicta and that he was not bound by it. Realizing the disruptive effect that announcement would have upon the state administrative proceeding and the ultimate abatement, we issued a supplemental order:
 
 
 42
 Neither the district court nor any party is free to ignore our determinations, including the determination that '(t)he resolution of the controversy over an on-land disposal site does not fall within the jurisdiction of the federal courts(,)' opinion of March 14, 1975 at 539. We think it inappropriate to characterize such a determination as 'advisory' or dictum.
 
 
 43
 514 F.2d at 541.
 
 
 44
 In direct disregard of that order, the district court has continued to interfere with the state proceedings. On November 14, 1975 the district court required United States Marshals to serve a letter on Minnesota public officials, members of the Minnesota Pullution Control Agency and Hearing Officer Wayne Olson, the administrative judge appointed to oversee selection of the on-land disposal site. The letter requested all these state officials to come to the November 14 hearing in the district court. On November 14 all of the state officials summoned were present. The court took a roll call of those present.
 
 
 45
 None of the proceedings in any way related to providing proper filtration of the drinking water. The proceedings on November 14, which Judge Lord himself branded as 'unusual,' instead were a broad consideration of the overall health evidence. Evidence was adduced by the court for the 'educational' benefit of the state officials and the hearing officer on selection of an on-land disposal site.
 
 
 46
 Although Judge Lord states that this proceeding was within his jurisdiction to develop new health evidence, it is obvious that the court below acted in defiance of this court's previous mandate, and that Judge Lord continues to attempt to influence the state administrative process concerning the feasibility and location of the on-land disposal site. Requesting the hearing officer and members of the Minnesota Pollution Control Agency to attend this court was for the precise purpose of exerting improper influence. The effect is added delay in that proceeding, and necessarily, delay in ultimate abatement.
 
 
 47
 The court commenced the November 14 proceedings by saying:
 
 
 48
 Sometimes I feel like a voice in the wilderness. I have heard, you know, like Moses he went up and they wrote it all out for him, nobody can witness his, they had to take Moses' word for it.
 
 
 49
 I am not comparing myself to Moses, but in this respect that it has all been here, it is all indelibly written on the record in this Court. Anyone, whether it be the state in its proceedings involving just what they are going to do and how much exposure they are going to allow, who does not know--in terms of where they are dumping this stuff, and so forth--who does not know exactly what the health risk, is derelict in their duty.
 
 
 50
 Now I am glad to see that some members of the Pollution Control Agency are here, I am glad to see that the hearing officer, Mr. Wayne Olson is here, and I address all of you and admonish you, that you are playing with fire. . . .
 
 
 51
 In every instance and under every circumstance Reserve Mining Company hid the evidence, misrepresented, delayed and frustrated the ultimate conclusions which had to be arrived at.
 
 
 52
 Now you have got to take that into account and put it aside and listen to the health evidence that is now available.
 
 
 53
 I would like to commence, because I may call upon you to give an accounting of what you have done by way of fulfilling your duty to your particular people on the health issue, I would like to take a roll call of who is present in the court room today. Just stand up and give your name and your association, if any, I would much appreciate it, and we will start with the little girl in the back row.
 
 
 54
 Transcript of November 14, 1975 hearing at 4--5 (emphasis added).
 
 Later the court observed:
 
 55
 And now I am going to have--in a few moments I am going to have some computations made for me, at my order, by a young man from the State, who will testify that under--I know I don't have any jurisdiction over where you put this material, whether you put it at Milepost 7, near a population center, or put it back in the pit or someplace else--that is your decision--but when you make that decision, if you can make it in the face of the evidence that we have here, that is your own judgment and your own conscience, because for 40 years there will be approximately 240 acres of exposed dump where trucks are running through population areas, dumping this material, building the dam, and you have to move it and massage it around.
 
 
 56
 Now, we will take what is in the Environmental Impact Statement here later today, and I will show you folks on the Pollution Control Agency, from the point of view of public health, which I understand you haven't had one iota of evidence on yet, what you are doing up on that dump to the people in Silver Bay and the tourists that drive along Highway 63
 
 
 57
 Id. at 55--56 (emphasis added).
 
 Later Judge Lord added:
 
 58
 Well, I just want to make it clear that I do not as of this time propose to assert any jurisdiction whatsoever over this aspect of it. It will, however, I believe that it properly be reviewed at the appropriate time I do believe that with this information people who have that decision may utilize this information and give consideration to what the concentrations of amphibole fibers might be for the tourists along Highway 65, the resorters, the school children at Beaver Bay and Two Harbors and give consideration to that in determining whether or not a hill containing some 500 acres of this loose material available to be wind borne should be erected down--upwind from those population.
 
 
 59
 I only brought that to you. Now, that is the one part of what I have done here today over which as of this point I am not asserting any jurisdiction.
 
 
 60
 I just thought that it might be possible that you might have overlooked the health hazard. I haven't read or heard anything about your considering it, nor have I any faith in what Arthur D. Little might tell you about that. They and Reserve have on every occasion I have observed them operating here in evidence multiplied any expense they have opposed or indicated might come up by a factor of three.
 
 
 61
 Id. at 109 (emphasis added).
 
 
 62
 Judge Lord's statements evidence a purposeful intent to influence the state officials to reject the Milepost 7 site. The district court's disclaimer of present jurisdiction cannot hide the purpose manifested by what he tole the state officials.
 
 
 63
 Equally significant, however, is the damaging effect the overall proceedings, since issuance of our mandate, must have on the administration of justice. Disregard of this court's mandate by a lawyer would be contemptuous; it can hardly be excused when the reckless action emanates from a judicial officer.[5] It is one thing for a district judge to disagree on a legal basis with a judgment of this court. It is quite another to openly challenge the court's ruling and attempt to discredit the integrity of the judgment in the eyes of the public. Not only was the district court's conduct 'in defiance of our mandate, but was understood (as) such.' United States v. Shipp, 214 U.S. 386, 425, 29 S.Ct. 637, 53 L.Ed. 1041 (1909). See also In re Herndon, 394 U.S. 399, 89 S.Ct. 1107, 22 L.Ed.2d 367 (1969).
 
 
 64
 Our system of government is premised upon subservience to the rule of law. If a judge in the exercise of judicial power loses sight of these principles, the result is autocratic rule by lawless judicial action.
 
 
 65
 In view of the fact that the petition for mandamus does not specifically seek removal of Judge Lord,[6] we decline to remove him on Reserve's petition. Nevertheless, taking cognizance of the record which discloses a deliberate denial of due process to the parties, a gross bias exhibited against defendant Reserve Mining Company, and an intentional violation of the mandate of this court, we order corrective measures sua sponte. In the exercise of this court's supervisory power over this litigation and in order to protect the integrity of this court's mandate we recall our earlier mandate in Reserve Mining Company v. Environmental Protection Agency and related cases (Nos. 73--1239, 74--1291, 74--1466, 74--1816, 74--1977, 75--1003, and 75--1005), 514 F.2d 492 (8th Cir. 1975), mandate issued May 5, 1975), and we modify the court's judgment in those cases by directing the remand therein to the district court and to the jurisdiction of the Chief Judge of the District of Minnesota. See Cascade Natural Gas Corp. v. El Paso Natural Gas Co., 386 U.S. 129, 136, 142--43, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967); Aerojet-General Corp. v. American Arbitration Ass'n, 478 F.2d 248, 254 (9th Cir. 1973); Greater Boston Television Corp. v. FCC, 149 U.S.App.D.C. 322, 463 F.2d 268, 277 (1971); Meredith v. Fair, 306 F.2d 374, 376--78 (5th Cir. 1962). We request that the remaining issues[7] be assigned to a new judge or to the Chief Judge himself if he chooses. If the Chief Judge of the District of Minnesota finds that no judge of the district is able to sit, he shall notify the Chief Judge of this circuit and request assignment of a visiting judge. We urge that the assignment be made with great expedition.
 
 
 66
 Accordingly, the mandate of this court issued on May 5, 1975 in Nos. 73--1239, 74--1291, 74--1466, 74--1816, 74--1977, 75--1003 and 75--1005 pursuant to the opinion issued on March 14, 1975 is recalled and amended in accord with this supplemental opinion and the cause is remanded to the Chief Judge of the District of Minnesota for further assignment to another district judge,[8] and the petition for mandamus is denied.
 
 
 
 [1]
 Section 82 of Public Law 93--251, 88 Stat. 12 (March 7, 1974), provides:
 The Chief of Engineers, in the exercise of his discretion, is further authorized to provide emergency supplies of clean drinking water, on such terms as he determines to be advisable, to any locality which he finds is confronted with a source of contaminated drinking water causing or likely to cause a substantial threat to the public health and welfare of the inhabitants of the locality.
 
 
 [2]
 In a letter lodged with this court sent by Col. Max W. Noah, District Engineer, to Mayor Robert Beaudin of Duluth, on December 8, 1975, the court is assured that such cooperation is now under way. Col. Noah wrote to Mayor Beaudin:
 
 
 [1]
 Could you please furnish specific information on the location and types of the 500 additional filters (multiple or single) which you desire. Provision of these additional filters will require approval of my superiors and must be justified under any circumstances. I suggest that your staff and mine examine the problem further as to geographical coverage of the populace for adequate distribution of filtered water
 
 
 [2]
 The problem of distributing water to the populace has been approached in the past by the Corps providing filters to public facilities where a large number of people gather normally and to decentralized points where private citizens could obtain water in their own containers. I would suggest that the method of supplying of water to individuals still be performed in this manner with a localized supply point being provided for individuals to obtain water in their own containers. Should the number of localities where the filtered water source is provided need to be increased, then we should address it under my response to your first point
 
 
 [3]
 Additional monitoring of filters presently installed in various buildings is being jointly accomplished by the Corps of Engineers, the Environmental Protection Agency's National Water Quality Laboratory, and Mr. David Peterson of Duluth. For your information, 20 filter installations have been identified and are being sampled on a weekly basis using both the existing filter cartridge and a new proposed cartridge type which does not have a fiberglas outer layer. We will continue to assist in monitoring efforts
 
 
 [4]
 Although the management and construction of the permanent filtration plant is not a part of our actions under PL 84--99, I share your concern that the earliest possible completion of the permanent plant is necessary for full protection of the populace. My Chief of Construction, Mr. Ruyak, will visit you this week to discuss detailed plans of a critical path approach to construction of your permanent filtration program. We will make recommendations concerning a consulting firm to work out the details and monitor progress throughout the duration of the construction period should this course of action be appropriate. The St. Paul District intends to provide full support within its authority of the temporary filtered water program in the north shore communities. To this end, I desire that our staffs work together and I will encourage full cooperation
 
 
 [3]
 The court said:
 I would like to see the Mayor of Duluth, the Duluth City Attorney and the members of the city council, because if they don't move for clean water, Duluth will have no clean water . . .. I will require that they pay it themselves out of their city treasury unless they move to collect it from Reserve.
 Transcript of November 10, 1975 hearing at 23.
 
 
 [4]
 On the evening of November 19, when the district judge knew that lead counsel were in Omaha, Nebraska to attend a hearing before this court, the district judge summarily summoned the remaining attorneys for Reserve and the Minnesota Pollution Control Agency. Counsel received notice at 4:40 P.M. while attending the state administrative hearings at Roseville, Minnesota. They arrived in court at 5:40 P.M. and found the proceedings already underway
 When Reserve objected to proceeding in the absence of other parties, the court stated, '(T)here are no attorneys available here . . . and . . . the Court . . . is forced to do the examination himself.' When Reserve objected that it had no notice that there was to be an evidentiary hearing, the district judge said, 'Well, if you don't want an evidentiary hearing, we will just take it as an information hearing.' Judge Lord then extensively examined witnesses, including Dr. Brown and Dr. Peterson. Transcript of November 19, 1975 hearing at 3--5.
 
 
 [5]
 From the very first, Judge Lord has expressed substantial disagreement with this court's opinion and the record shows his unwillingness to follow the letter and spirit of our mandate. On the day this court's opinion was announced, Judge Lord summoned counsel and in expressing dismay stated:
 The only one that can act arbitrarily in this case is Reserve Mining. That's apparently in the record here, including the Court, the parties, the States, the Federal Government and everyone else.
 Now, I think that is the law of the case and we must go on from there.
 Transcript of March 15, 1975 hearing at 7.
 
 
 [6]
 The motion for recusal was made orally
 
 
 [7]
 Among the issues remaining in the district court are:
 a) Supervision of any conflicts concerning abatement of air and water pollution, 514 F.2d at 539;
 b) Consideration of any new medical or scientific studies which may require re-evaluation of the health hazard attributable to Reserve's discharges upon which any of the parties may move for modification of time requirements for abatement. Id. at 540;
 c) Assessment of fines and penalties, Id.;
 d) Applications, if any, by the United States for additional relief if the State of Minnesota and Reserve are not moving with deliberate speed to facilitate Reserve's termination of its water discharge and air pollution. Id. at 538;
 e) Damages arising by reason of cost of interim abatement.
 
 
 [8]
 In view of the reopening of the mandate with direction to the United States to continue filtration of the water supply with adequate inspection and supervision and in view of the obvious impropriety of the district judge's order requiring Reserve to deposit funds without proper notice and hearing the order of the district court is hereby dissolved and the required deposit of $100,000.00 is ordered returned, and the appeal in No. 75--1942 is rendered moot and the appeal is dismissed