Madison ANDERSON,
Plaintiff–Appellant,

v.

Walter SHEPPARD, et al., Defendants,

Ford Motor Company,
Defendant–Appellee.

No. 87–1207.

United States Court of Appeals,
Sixth Circuit.

Argued March 21, 1988.

Decided Sept. 7, 1988.

Rehearing and Rehearing En Banc
Denied Nov. 17, 1988.

Charles E. Fonville (argued), Detroit, Mich., for plaintiff-appellant.

Kermit G. Bailer, Arnold Shulman (argued), Dearborn, Mich., Michael J. O'Reilly, for defendant-appellee.

Before JONES, MILBURN and BOGGS, Circuit Judges.

MILBURN, Circuit Judge.

Plaintiff-appellant Madison Anderson appeals from the judgment entered on a jury verdict in favor of defendants in this civil rights action. For the reasons that follow, we reverse and remand for a new trial.

I.

Anderson, a black male, was first employed by defendant-appellee Ford Motor Company ("Ford") on October 27, 1952. In September 1975, he applied for the position of waste treatment operator, but this application was denied. Anderson claims that the job was later filled by a less qualified caucasian male. In 1976, Anderson filed a complaint with the Equal Employment Op-

portunity Commission ("EEOC"), claiming that his failure to obtain the position was the result of race discrimination. He also filed a grievance with his labor union, and pursuant to a grievance settlement, he was placed first on the seniority list for a position at the waste treatment plant.

In 1979, Ford enlarged its waste treatment plant and increased the number of operators from seven to ten. Anderson was hired for one of the new positions. Subsequently, however, Ford claims it determined that its initial assessment of the number of persons needed to operate the enlarged plant was erroneous. Thereafter, Ford reduced the number of operators from ten to seven. One caucasian operator was laid off in 1979, another caucasian operator was laid off in 1980, and Anderson was laid off in September of 1980.

Between December 1980 and June 1981, Anderson, Ford, and the EEOC worked toward resolving Anderson's still-pending 1976 complaint. In June of 1981, Anderson and Ford entered into a conciliation agreement providing that Anderson would receive One Thousand Five Hundred ($1500) Dollars and would return to work. Anderson was rehired as a waste treatment operator pursuant to the agreement, but was laid off again in September 1981. Anderson then brought the present action, claiming that the September 1981 layoff and Ford's failure to recall him were in retaliation for his filing of the 1976 EEOC complaint, alleging violations of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and other causes of action.

On January 24, 1984, the district court granted summary judgment for Ford on most of Anderson's claims. The claims remaining for trial were the Title VII and section 1981 race claims concerning the September 1981 layoff and corresponding failure by Ford to recall Anderson to employment.

A jury trial commenced on June 11, 1984. At the end of all proof, the district court found for Ford on the Title VII allegations and, pursuant to Ford's motion, directed a verdict regarding the section 1981 claims.

On appeal, this court reversed and remanded for a new trial, holding in an unpublished opinion that as there were factual disputes that should have been resolved by the jury and not by the district court, the district court erred in directing a verdict and entering a judgment thereon.

On remand, Anderson's former trial counsel, who was planning to change her residence from Michigan to California, withdrew from the case on August 26, 1986. Anderson then obtained new trial counsel, Lynn Shecter, on September 8, 1986. Thereafter, at the urging of both parties' counsel, the district judge mediated settlement negotiations between the parties. When attempts to settle failed, the case was rescheduled for trial on December 4, 1986.

On December 2, 1986, *two days before the scheduled trial date,* Anderson's second attorney, upon motion, was allowed to withdraw. The following colloquy between the court, counsel, and Anderson took place:

Ms. Shecter: May it please the Court, Lynn Shecter appearing on behalf of plaintiff. This is our motion to withdraw as counsel for Mr. Anderson.

The Court: I understand, Ms. Shecter. Mr. Anderson had one lawyer, now he has *another lawyer, and he wants to get a third lawyer.*

Ms. Shecter: I can't speak for others but Mr. Anderson has a right to have someone represent him, but we seem to have a difference of opinion and a difference of opinion as to how to approach this case.

The Court: Mr. Anderson, perhaps you will remember that Francis McIntyre spent a whole afternoon in which she encouraged you to resolve this matter with Ford. You didn't like her advise [sic] and she withdrew. You got Ms. Shecter, who is a very competent lawyer, who does a lot of work in this area, you can't agree with her advice so she has to get out. What makes you think you are ever going to find a lawyer that will carry this case forward the way you want it? *If two competent lawyers, one of whom even got a victory for*

*you in the Court of Appeals, after I threw the case out, put egg on my face—I'm not made [sic] about it. You're going to have to end up trying this case yourself with no help from anyone.* You know what they say about a plaintiff that has himself for a client? Do you think you can try this case in front of a jury by yourself?

Mr. Anderson: I don't know.

The Court: Do you think I could get out and run a sewage treatment plant? I wouldn't know which way the sewage was coming in and going out.

Mr. Anderson: I can show you.

The Court: You can show me but I'm not going to show you how to try a case. I can't do that. You're going to be sitting here by yourself in front of a jury, is that what you want?

Mr. Anderson: I don't want that.

The Court: What do you want then? What do you want? Do you think Ms. Shecter is taking a dive, saying she doesn't like this case, or Mr. Schulman [Ford's attorney] has sweet-talked her or something, is that what you think?

Mr. Anderson: Your Honor, I'm not saying that I think that.

The Court: What are you saying?

Mr. Anderson: I'm saying that I believe that I can get somebody to try it.

The Court: What makes you think that you can do any better than her? You've already gotten two lawyers. I'm not going to give you—if she wants to withdraw I'm going to let her. I don't force lawyers to stay in a case. There are some judges that would. I'm not going to give you anymore indulgence. *If I had my druthers I would start the trial of this case tomorrow morning, but I can't because I have another case I'm trying.*

Mr. Anderson: Well, I would like at least twenty-five days.

The Court: *If I let her go I'm going to tell Ms. Cassady [clerk] to put this case on the call, and whenever she finds a date in time to set it for trial* we will bring you in, bring Mr. Schulman in, we will bring jurors in and we will go ahead and retry

the case like the Court of Appeals told me to. You may win. You may not. *The odds are against you, you know that, don't you?*

Mr. Anderson: It seems that way.

The Court: I Just [sic] got done trying a criminal case where a fellow represented himself. He's in jail today. He didn't even know how to defend himself against my revoking his bond. This is a tough place down here—it's not tough, it's complicated. But what really bothers me, Mr. Anderson, is a competent lawyer has given you some advise [sic]. Apparently when you hired her you figure she could do you some good.

Mr. Anderson: I think the advice she gave me the other day about Ford Motor to make a settlement on this case I went along with, and then later on I come back because, I guess, Ford didn't want to make a settlement on it.

.      .      .      .      .

The Court: ... The lawyers are telling you something that you don't want to hear and you shoot the messenger. Instead of keeping your ears open and listen you get rid of the lawyer. If a lawyer has a case, and if in the lawyers [sic] best judgment the case has reached the point where it should be resolved on certain terms; the lawyer, in good faith, can't go forward.

.      .      .      .      .

I have to assume she wants to make money like everybody else. There is nothing wrong with that. She wouldn't withdraw from the case if she thought she could do better for you. The problem is she is afraid she will do a lot worse, in her judgment, as a lawyer.

.      .      .      .      .

The Court: I'm going to tell you something candidly. I made only one mistake in this case—I should have let it go to the jury. Mr. Schulman sweet talked me. He knows he made a mistake. *If it had gone to the jury, the jury would have sent you down the tube. You got a second chance in this case, in my judgment, on a technicality.* But this whole case is now an open book. There is a complete transcript of everything, and there is no new evidence

that is going to come out to a second jury that wasn't there for the first jury. She can read the whole case, and all she has to do in her head is make an assessment of how six people, she doesn't know from a bale of hay, are going to decide this case. *She has made a judgment that the jury that comes in here, wherever they come from, that she is going to do better with that settlement than the other odds. Now, maybe you're a big gambler.* You once talk [sic] me you didn't gamble.

Mr. Anderson: You said street corner gambling. I don't gamble on street corners, no, I do not.

The Court: *You're gambling here, you're shooting craps. You get rid of her and you don't take that settlement, it's a straight crap shoot for you, that's what it is.* It's a straight crap shoot, if that's what you want. I'm salaried, I'll be here everyday. It doesn't make any difference to me.

Mr. Anderson: I feel that there has been new evidence because in the first trial we had nine witnesses, and none of them ever took the stand.

The Court: Do you think you're going to get any of those in this time?

Mr. Anderson: I might not get them. I might not. I probably won't.

The Court: Then what are you doing?

Mr. Anderson: Because I want to take that chance. I want to take that chance to get those witnesses on the stand.

.     .     .     .     .

The Court: You know there's no law against a guy killing himself in the courtroom, I guess, figuratively speaking. Present an Order. *The Clerk will set the case down for trial at the earliest trial date. There will be no adjournment, except for the convenience of the Court, and, if you go and get a lawyer, fine, but I will not give the lawyer any additional time to prepare other than the date set for trial.*

.     .     .     .     .

The Court: I think you're doing a dumb thing but that's up to you.

Joint Appendix at 27–35 (emphasis supplied). Anderson was notified on December 10, 1986, that trial was set for January 20, 1987.

After the hearing, Anderson sought to engage new counsel. However, he was unsuccessful in light of the court's directive that new counsel be given no additional time to prepare. One attorney indicated that he refused to accept the case because he could not do so without a sixty-day continuance to become familiar with the case and complete some discovery. He provided Anderson with a signed letter to that effect. J.A. at 500.

On January 20, 1987, Anderson moved the court for additional time to retain an attorney and presented the letter indicating that an attorney would represent him if he had a sixty-day continuance. The district court denied the motion, holding:

The record will reflect that this case was initially tried to a jury. The Court granted a directed verdict in favor of the defendant. That case was appealed and reversed. The case was remanded to this Court for a new trial in June 1985. After which then plaintiff's counsel Francis McIntyre moved to California, and at her urging and defense counsel's urging *the Court itself involved informal attempts to resolve this matter.* When it could not be resolved, based upon Ms. McIntyre's recommendation, she withdrew.

Plaintiff then obtained new counsel in the person of Lnn [sic] Shecter, also experienced in these matters. When it could not be resolved on her recommendation, in which the Court involved itself in the request of counsel, she withdrew.

.     .     .     .     .

The motion is denied. This case has dragged since last June. *Twice the plaintiff has been advised by competent counsel that he should resolve it in the terms offered by Ford.* It now appears, as I understand it, that the position he initially sought has now been granted to him. . . . The plaintiff has had ample time to obtain counsel. As I said, *he has had two competent lawyers, both expe-*

*rienced in civil rights litigation recommend a settlement to him which he has declined.* He has been fully aware of the precarious position he has been in with regard to counsel. It seems to me that he has had more than enough time to obtain counsel, and if that counsel believed that a continuation or adjournment was necessary because certain discovery was needed, notwithstanding the fact that this case once went to trial by competent counsel, they certainly could have entered an appearance and moved the Court for such purposes. No lawyer has appeared since Ms. Shecter. Under the circumstances the motion is denied.

Joint Appendix at 38–42 (emphasis supplied).

A jury trial commenced on January 26, 1987, at which Anderson represented himself *pro se.* At the conclusion of the trial two days later, the jury returned a verdict of no cause of action on the section 1981 claims, and the district court entered judgment in favor of Ford on Anderson's Title VII claims.

Anderson, *who is now represented by counsel,* argues on appeal that the actions of the district court on December 2, 1986, and January 20, 1987, deprived him of his right to counsel and of his right to a trial before a fair, impartial, and unbiased arbiter.

## II.

### A. *Judicial Bias and Hostility*

It is beyond dispute that "[a] fair trial in a fair tribunal is a basic requirement of due process. Fairness, of course, requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). More than thirty years ago, we addressed the proper role of a judge in judicial proceedings:

One of the fundamental rights of a litigant under our judicial system is that he is entitled to a fair trial in a fair tribunal, and that fairness requires an

absence of actual bias or prejudice in the trial of the case. *If this basic principle is violated, the judgment must be reversed.*

Bias or prejudice on the part of a judge may exhibit itself prior to the trial by acts or statements on his part. Or it may appear during the trial by reason of the actions of the judge in the conduct of the trial.

. . . .

... The judge should exercise self-restraint and preserve an atmosphere of impartiality. When the remarks of the judge during the course of a trial, or his manner of handling the trial, clearly indicate a *hostility to one of the parties, or an unwarranted prejudgment of the merits of the case,* or an alignment on the part of the Court with one of the parties for the purpose of furthering or supporting the contentions of such party, the judge indicates, whether consciously or not, a personal bias and prejudice which renders invalid any resulting judgment in favor of the party so favored.... "[T]he tribunals of [this country] shall not only be impartial in the controversies submitted to them but shall give assurance that they are impartial, free ... from any 'bias or prejudice' that might disturb the normal course of impartial judgment."

*Knapp v. Kinsey,* 232 F.2d 458, 465–67 (6th Cir), *cert. denied,* 352 U.S. 892, 77 S.Ct. 131, 1 L.Ed.2d 86 (1956) (citations omitted and emphasis supplied).

As this court has repeatedly noted, "great care must be taken by a judge to 'always be calmly judicial, dispassionate and impartial. He should sedulously avoid all appearances of advocacy....'" *United States v. Hickman,* 592 F.2d 931, 933 (6th Cir.1979) (quoting *Frantz v. United States,* 62 F.2d 737, 739 (6th Cir.1933)). In sum, "the basic requirement is one of impartiality in demeanor as well as in actions." *United States v. Frazier,* 584 F.2d 790, 794 (6th Cir.1978). At the end of a trial, although a litigant may be disappointed in the outcome, he should leave the court-

house feeling that he has been treated fairly, and that his case had been decided by a neutral and impartial arbiter.

In *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980), the Supreme Court recognized that the "requirement of neutrality in adjudicative proceedings" serves dual interests of equal importance, as "it preserves *both* the *appearance* and *reality* of fairness, 'generating the feeling, so important to a popular government, that justice has been done,' by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him." *Id.* at 252, 100 S.Ct. at 1618 (quoting *Joint Anti–Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 172, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)) (emphasis supplied). Thus, the neutrality requirement not only guarantees that each litigant receives a fair trial as determined by those learned in the law, but also engenders the faith in the integrity of this country's tribunals that is so unquestionably vital to this government's existence.

In his dissenting opinion, Judge Boggs concludes that although bias and hostility may have been exhibited prior to trial, the absence of any such hostility or bias during the course of the subsequent trial justifies an affirmance of the judgment presently before us because any bias and hostility were, in essence, harmless error. However, it is undisputable that a trial judge can communicate hostility and bias to a jury in ways that are not ascertainable from a reading of a "cold" written record of the proceedings. It should also be noted that the court, not the jury, evaluated Anderson's Title VII claims.

Moreover, it is our view that the dissenting opinion improperly focuses solely upon the fair trial aspect of the neutrality requirement. As illustrated above, the neutrality requirement serves *dual* purposes. It not only serves to preserve a fair trial, it also exists to engender public faith in the fairness and integrity of our tribunals.

Not only must litigants actually receive a fair trial, they must also believe that they have been given a fair trial. *See Connelly v. United States Dist. Court*, 191 F.2d 692, 697 (9th Cir.1951) ("It is not enough that the judge, despite his predetermination of essential facts, may put them aside and conduct a fair trial but that there also shall be such an atmosphere about the proceeding that the public will have the 'assurance' of fairness and impartiality."). It is then, and only then, that people will tender their disputes to our courts for resolution.

It is for the second reason that we require not only an absence of actual bias, but an absence of even the appearance of judicial bias. As Justice Frankfurter has eloquently noted:

"In a government like ours, entirely popular, care should be taken in every part of the system, not only to do right, but to satisfy the community that right is done." 5 The Writings and Speeches of Daniel Webster, 163. The same thought is reflected in a recent opinion by the Lord Chief Justice. A witness in a criminal case had been interrogated by the court in the absence of the defendant. Quashing the conviction, Lord Goddard said: "That is a matter which cannot possibly be justified. I am not suggesting for one moment that the justices had any sinister or improper motive in acting as they did. It may be that they sent for this officer in the interests of the accused; it may be that the information which the officer gave was in the interests of the accused. That does not matter. Time and again this court has said that justice must not only be done but must manifestly be seen to be done." *Rex v. Bodmin*, JJ. [1947] 1 K.B. 321, 325.

*McGrath*, 341 U.S. at 172 n. 19, 71 S.Ct. at 649 n. 19 (concurring opinion). Because of the fundamental need for judicial neutrality, we hold that the harmless error doctrine is inapplicable in cases where judicial bias and/or hostility is found to have been exhibited at any stage of a judicial proceed-

ing.[1] Although there is no mechanical test for determining when bias and/or hostility exists, when a trial judge exhibits the open hostility and bias at the beginning of a judicial proceeding as was exhibited here, it follows that the judgment entered therein must be reversed.

We realize our holding enunciates a stringent rule, and that "[s]uch a stringent rule may sometimes bar trial by judges who have no actual bias and who will do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.'" *Murchison*, 349 U.S. at 136, 75 S.Ct. at 625 (quoting *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1955)).

In this case, we conclude that the conduct of the district court has failed to reasonably conform to the above-enunciated standards. The appearance of judicial bias and hostility is evident in the record as set out above. Initially, the record indicates that the district court was hostile toward Anderson because this court had reversed the district court, and, in the words of the district judge, "put egg on [his] face" in reversing on what he described as a "technicality." J.A. at 28, 32. Moreover, the district court had become involved in the settlement negotiations, and had clearly determined that Anderson should settle on the terms offered by Ford. In evidencing that clear bias, the district judge informed Anderson that if the case had gone to the jury in the first trial, "the jury would have sent [Anderson] down the tube." Anderson was informed that he was "shooting craps" and that the odds were clearly against him at a second trial. In essence, the district court was no longer an impartial or unbiased arbiter, but had from all outward appearances assumed the posture of an advocate. *See Reserve Mining Co. v. Lord*, 529 F.2d 181, 186 (8th Cir.1976) (en banc) ("[w]hen the judge joins sides, the public as well as the litigants become overawed, frightened and confused."). The bias and hostility of the district court can perhaps be best summed up in his concluding statement to Anderson that "I think you're doing a dumb thing...." J.A. at 35.

We are "aware that self-restraint and the preservation of an atmosphere of impartiality is not always easy...." *Nicodemus v. Chrysler Corp.*, 596 F.2d 152, 156 (6th Cir.1979). However, we find "that these remarks [are] both unsupported by the record and unnecessary in the circumstances." *Id.* at 155.

### B. *Right to Counsel*

While case law in the area is scarce, the right of a civil litigant to be represented by retained counsel, if desired, is now clearly recognized. See *Goldberg v. Kelly*, 397 U.S. 254, 270–71, 90 S.Ct. 1011, 1021–22, 25 L.Ed.2d 287 (1970) (welfare recipient must be allowed to retain an attorney at welfare termination hearing if recipient so desires); *Gray v. New England Telephone & Telegraph Co.*, 792 F.2d 251, 256–57 (1st Cir.1986); *Indiana Planned Parenthood Affiliates Assoc. v. Pearson*, 716 F.2d 1127, 1137 (7th Cir.1983); *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1117–19 (5th Cir.), *cert. denied*, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980). Recognition of this right can be traced back to the Supreme Court's holding in *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), where the Court held that "[i]f in any case, *civil or criminal,* a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense." *Id.* at 69, 53 S.Ct. at 64 (emphasis supplied).

At the outset, the distinction between criminal defendants and civil litigants should be noted. "A criminal defendant's right to counsel arises out of the sixth

---

1. We are not holding that a judge should not become involved in the settlement process. We are simply holding that if a trial judge's involvement in the settlement process has resulted in bias or an unwarranted prejudgment of the merits of the case, or the appearance thereof, then any resulting judgment in favor of the party so favored is invalid.

amendment, and includes the right to appointed counsel when necessary." *Potashnick*, 609 F.2d at 1118. In contrast, "[a] civil litigant's right to retain counsel is rooted in fifth amendment notions of due process; the right does not require the government to provide lawyers for litigants in civil matters." *Id.* Moreover, "[a] criminal defendant faced with a potential loss of his personal liberty has much more at stake than a civil litigant asserting or contesting a claim for damages, and for this reason the law affords greater protection to the criminal defendant's rights." *Id.*

There are, however, similarities between the two. As the Supreme Court noted in *Powell*, "[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." 287 U.S. at 68–69, 53 S.Ct. at 63–64; "In both cases the litigant usually lacks the skill and knowledge to adequately prepare his case, and he requires the guiding hand of counsel at every step in the proceedings against him." *Potashnick*, 609 F.2d at 1118. Finally, "[i]n each instance, the right to counsel is one of constitutional dimensions and should thus be freely exercised without impingement." *Id.*

█ While noting that the district court did not directly bar Anderson from retaining counsel, we hold that the district court abused its discretion in failing to grant Anderson a reasonable time to obtain counsel. While "[t]he matter of continuance is traditionally within the discretion of the trial judge, ... a myopic insistence upon expeditiousness in the face of justifiable request for delay can render the right to defend with counsel an empty formality." *United States v. 9.19 Acres of Land,* 416 F.2d 1244 (6th Cir.1969) (per curiam) (quoting *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1963)).

In the present case, two days before the scheduled trial date, the district court allowed Anderson's counsel to withdraw.[2]

The court then denied Anderson's request for twenty-five days to obtain counsel. In so holding, the court informed Anderson that if it could, it would start the trial of the case the next day. Since another case was already scheduled for that day, the court informed Anderson that his trial would be heard the very first available date, and held that there would be no continuance except for the convenience of the court. If Anderson was able to obtain another lawyer, the district court held that the lawyer would have no additional time to prepare other than the date set for trial. J.A. at 35.

The trial date was subsequently reset for January 20, 1987. In his dissenting opinion, Judge Boggs concludes that the district court did not abuse its discretion because, in retrospect, Anderson had more than the requested twenty-five days to obtain counsel. However, that time period cannot be considered in a vacuum, as we have to examine the effect that the district court's remarks and holding would have on any opportunity to obtain counsel. Moreover, it was simply happenstance that Anderson received more than twenty-five days to obtain counsel. As counsel for Ford conceded at oral argument, had the district court's calendar cleared, by settlement or otherwise, the case would have proceeded to trial before January 20, 1987, as the district court desired the case to be heard on the earliest available trial date.

Realistically, we find it untenable that a client would be able to secure new counsel for a complex Title VII case, or any civil rights action, when counsel would be aware of the district court's admonition that the case would proceed in a very short time ("the earliest trial date"), and there would be no additional time granted for counsel to become familiar with the case, or to prepare for trial. In fact, the district court was presented with a signed letter from an

---

2. The *Model Code of Professional Responsibility* (1981) provides that in withdrawing from employment, "a lawyer shall not withdraw from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his client, including giving due notice to his client, *allowing time for employment of other counsel,* delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules." DR 2–110(A)(2) (emphasis supplied).

attorney indicating that he would represent Mr. Anderson, but could not do so without sixty days to become prepared. J.A. at 500. Thus, the record reflects that, had the district court granted a continuance, Anderson would have been able to obtain counsel.

Moreover, the record provides no reasonable justification for the district court's denial of the continuance. Instead, the record reflects that the district court was *hostile* toward Anderson not only because he had successfully appealed the district court's earlier disposition of the case, but also because he refused to accept the settlement offer tendered by Ford. The fact that a litigant refuses to accept a settlement offer, even if the court and his former counsel determine that the settlement would be the best resolution of the case, does not justify denying the litigant a reasonable opportunity to retain trial counsel. In sum, a court should not use the threat of trial without counsel as a means of achieving a pretrial disposition of a case. That the court has concluded the settlement offer would be in the best interests of the litigant is wholly immaterial.

In holding that the district court infringed Anderson's due process rights to retain counsel, we note that "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case...." *United States v. 9.19 Acres of Land,* 416 F.2d at 1245 (quoting *Ungar,* 376 U.S. at 589, 84 S.Ct. at 849). Under the circumstances of this case, we find the actions of the district court to be unreasonable. As the right to retain counsel is fundamental to a fair trial, we will not consider whether the error was harmless.[3]

### III.

Accordingly, the judgment of the district court is REVERSED, and this case is REMANDED for proceedings consistent with this opinion.

BOGGS, Circuit Judge, dissenting.

The court finds two separate reasons for reversing the jury's verdict of no cause of action against Ford Motor Company in this race discrimination suit by Madison Anderson:

(1) the district court abused its discretion in refusing plaintiff a further continuance to allow additional time to procure a third attorney, where trial occurred 55 days after his previous attorney had withdrawn, and 47 days after a trial date was set; and,

(2) the district judge, in any event, "exhibit[ed] such open hostility and bias" toward plaintiff in a hearing on a pre-trial motion of counsel to withdraw as to disqualify him from sitting.

I respectfully disagree with both of these holdings. While the district judge's actions may well have been less than charitable, the law in this Circuit does not support a holding that the judge went beyond the bounds of what is permissible for a trial judge in exercising discretion. I do not believe that any possible attractiveness of the current plaintiff or his case justifies our reversing the district judge because we might have acted differently were we in his shoes.

### I

The charge of bias and hostility is particularly disturbing to any judge. In our case, the district judge had been asked *by both sides* to attempt a settlement. He did so, to the best of his ability. A settlement offer from the plaintiffs was on the table,

---

**3.** Assuming *arguendo* that we examine the record for prejudice, we find that the error was far from harmless, especially in light of the earlier holding of this court that the issues were substantial enough that they should be decided by a jury. From our review of the record, it is clear that Anderson had no concept of the analysis set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d

668 (1973). He did not know of the proper composition of an opening statement nor its purpose. He had no concept of, nor any knowledge of, how to respond to the motion *in limine* of Ford that was granted by the court. He had no understanding of relevance and did not know how, nor when, to object to improper evidence and argument. Moreover, he did not know how to testify as a witness.

and it was the judge's opinion that it should be accepted. Apparently that was also the opinion of one or both of plaintiff's previous retained counsel, and the plaintiff's unwillingness to accept the settlement was the cause of the withdrawal of the second counsel.

The proceedings which were quoted so extensively in the court's opinion occurred out of the presence of any jury and long before the actual jury trial took place. It is true that the district judge "talked turkey" to the defendant, in a manner perhaps more suitable to vigorous private advocacy than to public judicial demeanor. However, there is not the slightest hint from the record, nor allegation from the plaintiff, that the judge's demeanor at the subsequent trial, nor any rulings he made there, were in any way influenced by or reflective of the incident some two months earlier.

It is particularly relevant that the matters complained of here took place in the course of settlement proceedings. This distinction was very well covered in the case of *Fong v. American Airlines, Inc.*, 431 F.Supp. 1334 (N.D.Cal.1977), in which a motion for disqualification was denied. There the court stated:

> If comments made by a court in the course of pretrial proceedings, based on matters disclosed by the case file at that time were regarded as extrajudicial, the court's ability to promote the settlement of civil litigation would be crippled. Judicial intervention in the settlement process, even if not universally favored or practiced, is an absolute necessity in the federal judicial system, burdened as it is by a staggering and ever-growing case load.
>
> ....
>
> To subject judges to the risk of disqualification on the basis of statements of this kind would jeopardize their effectiveness as catalysts in the settlement process.

431 F.Supp. at 1338–39 (footnote omitted). *See also Johnson v. Trueblood*, 629 F.2d 287 (3rd Cir.1980), *cert. denied*, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981);

*In re Turner*, 69 B.R. 95 (Bkrtcy.S.D.Ohio 1987).

This case differs from the actions of district judges all over the country in attempting the settlement of thousands of cases, only in that it occurred in a public session on the record. I simply fail to see that the vigorous expression of opinion as to the desirability of a settlement and as to the possible future course of events (essentially borne out by the facts) subjects a trial judge, as a matter of law, to indictment and conviction by this court on the charge of bias and hostility.

In particular, it should be the essence of the function of a judge to be able to concentrate on the matter at hand and not allow distractions of personal, social or political feelings to interfere. There is no evidence that the district judge did not do so in the trial of this case.

In virtually all of the major cases cited by the court, the conduct that displayed hostility and bias occurred during the actual trial. Thus, *Knapp v. Kinsey*, 232 F.2d 458 (6th Cir.1956), emphasized the judge's courtroom expressions, although it did also note the judge's attack on the well-respected general counsel of the SEC (and now Senior United States Circuit Judge), William H. Timbers, holding him in contempt and placing him custody of the U.S. Marshals.

In the case of *U.S. v. Frazier*, 584 F.2d 790, 794 (6th Cir.1978), the court emphasized trial demeanor, quoting with approval our statement in *Frantz v. U.S.*, 62 F.2d 737, 739 (6th Cir.1933), that a judge should "avoid all appearance of advocacy as to those questions which are ultimately *to be submitted to the jury*." (emphasis added). This was certainly done in this case.

Also, certainly nothing that occurred here approached the pretrial expressions by the judge that led to reversal in *Nicodemus v. Chrysler Corp.*, 596 F.2d 152 (6th Cir.1979). During a preliminary injunction hearing, the judge referred to the defendants as follows: "This thing is most transparent and the most blatant attempt to intimidate witnesses and parties that I have seen in a long time. I don't believe any-

thing that anybody from Chrysler tells me.... They're a bunch of villains ... and I don't intend to put up with it." 596 F.2d at 155. He also stated his doubts as to his ability to conduct future matters impartially: "I shall do my best not to allow myself to be swayed by the episodes that have been brought before me today, although there is no particular reason why under the law I should." 596 F.2d at 156.

Other examples of conduct at trial similar to our situation where reversal was not warranted include: *Jaffe v. Grant,* 793 F.2d 1182 (11th Cir.1986); *Wiley v. Wainwright,* 793 F.2d 1190 (11th Cir.1986); *Watson v. Miears,* 772 F.2d 433 (8th Cir.1985) (no bias in warning counsel of consequences of failure to comply with discovery orders). Even in the cases involving conduct at trial, it is clear that "[t]he alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge has learned from his participation in the case." *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966). *Accord, In re International Business Machines Corp.,* 618 F.2d 923, 927 (2d Cir.1980); *First National Monetary Corp. v. Weinberger,* 819 F.2d 1334, 1337 (6th Cir.1987).

As noted in *United States v. Story,* 716 F.2d 1088, 1090 (6th Cir.1983), the word "bias" can be used in two ways:

> The bias must be personal, not judicial. It must arise " 'out of the judge's background and association' and not from the 'judge's view of the law.' " *United States v. Story,* 716 F.2d 1088, 1090 (6th Cir.1983) (quoting *Oliver v. Michigan State Board of Education,* 508 F.2d 178, 180 (6th Cir.1974), *cert denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975)).

There is not the slightest indication that any bias in this case came from the Judge's background outside of the case and thus was "personal" in the context of the above opinions. *See also United States v. Port-*er, 701 F.2d 1158, 1166 (6th Cir.), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983) ("Impressions based on information gained in the proceedings are not grounds for disqualification in the absence of pervasive bias.").

Mere vigor of expression or firmness of view on particular points does not render a judge incapable of giving a judicially unbiased opinion.[1] It is my clear impression that the examination of any month's worth of transcripts of the arguments in this Circuit would reveal at least one and probably more instances of judges expressing their displeasure with those before them in terms no less vigorous than did Judge Cohn in this case. I fear that this precedent of disqualification of a judge for "bias and hostility" because of such vigorous expression is one that would not bear extension throughout our domain.

Finally, I believe the court's opinion, at page 12, overstates the importance of litigant's subjective belief that they have received a fair trial. The court states: "Not only must litigants actually receive a fair trial, they must also believe that they have been given a fair trial." Rather, our system rests on an *objective* standard of whether a fair trial occurred. See, e.g., *In re Beard,* 811 F.2d 818, 827 (4th Cir.1987); *United States v. Greenough,* 782 F.2d 1556, 1559 (11th Cir.1986). I know of no precedents overturning the results of trials because losing litigants did not think the trial was fair. While there may be some saintly litigants who believe they received a fair trial even after losing, I do not doubt that such litigants are rare.

## II

As to the denial of a continuance, we have here a matter which is quintessentially within a district judge's discretion. The constitutional law, and our cases, are quite clear on this point. A civil plaintiff has no right to appointed counsel. Plaintiff has a right to a counsel, if he can procure one, and a trial court may not prevent the appearance of such counsel. However, the trial judge is not required to wait any par-

---

1. While vigor can be overdone, see K. Llewellyn, The Common Law Tradition 37 (1960) on the virtues of pungency.

ticular period of time while a party attempts to procure one.

In this case, plaintiff had previously retained two separate counsel. The case had been pending for over 4 years, and for well over a year after a remand by this court following a first trial. At the time plaintiff's retained counsel sought to withdraw, a trial date had been set, only 2 days in the future,

A plaintiff has no particular right to abort a trial immediately before it is scheduled to commence simply because of the absence of counsel. Several steps were open to the district court:

1. he could have denied the counsel permission to withdraw;
2. he could have proceeded to an immediate trial on the date scheduled, with or without counsel; or
3. he could have postponed the trial, allowing the plaintiff additional time to procure counsel.

Without intimating whether there would have been any abuse of discretion had the judge chosen one of the first two options, in these circumstances, the last option is what in fact happened.

Despite the judge's statements at the December 2 hearing that the trial would start just as soon as possible, which would have left the plaintiff with an uncertain and indeterminate time to procure counsel (though it would in any event have behooved him to move as rapidly as possible), on December 10 the court set a specific trial date, which was 41 days in the future from the time it was set, and 49 days from the initial hearing. This was considerably *more* than the 25 days that Anderson asked for.

The court's opinion declares (at page 17) that counsel for appellant "conceded" that the case "would have proceeded to trial" earlier than scheduled, if the court's calendar had cleared. After reviewing the record of oral argument, I cannot agree with that characterization. In the exchanges on this point at oral argument, all the counsel conceded, as was also pointed out by members of the panel, was that it

would have been within the Judge's power to issue an order advancing the announced trial date, and that "it has happened" that a trial date had been advanced in district court in Detroit. However, counsel did not concede that Judge Cohn's purpose to have the trial at the earliest possible date, as stated on December 2, continued to prevail despite his later order setting a specific trial date.

Thus, the plaintiff definitely had an unencumbered period of at least 47 days in which to procure counsel for the trial.[2] No case that I found, or that is cited by the court, has found an abuse of discretion where a civil plaintiff is given that length of time. The cases that have reversed denials of a continuance have generally involved requests for very brief periods of time. Thus, in *United States v. 9.19 Acres of Land*, 416 F.2d 1244 (6th Cir.1969), which the court cites, a judge was reversed for allowing only one week after an appellant was informed that a corporation could not prosecute a case *pro se*. In that very case, *id.* at 1245, this circuit noted other cases where "the courts granted reasonable continuances" including *Shapiro, Bernstein and Co. v. Continental Record Co.*, 386 F.2d 426 (2d Cir.1967) (14 days); *MacNeil v. Hearst Corp*, 160 F.Supp. 157 (D.Del.1958) (30 days); *Brandstein v. White Lamps*, 20 F.Supp. 369 (S.D.N.Y. 1937) (20 days). I would also note the criminal case of *U.S. v. Mitchell*, 744 F.2d 701, (9th Cir.1984) where granting only a 43-day continuance, when 57 days were requested, was not reversible error.

Other cases reversing denial of a continuance include in a criminal context, *U.S. v. Gallo*, 763 F.2d 1504, 1523 (6th Cir.1985) (10 days not granted). The longest period deemed insufficient in a case I located is *In re Estate of Rutherfurd*, 304 So.2d 517, 521 (Fla.App.1974), where one month had been available to secure counsel in a very hostile area but was deemed insufficient and further "reasonable time" was granted. Perhaps the closest case on point to our situation is *Grunewald v. Missouri Pacific Railroad Co.*, 331 F.2d 983 (8th Cir.1964) where Judge (now Justice) Black-

---

**2.** Jury impanelment apparently was set on January 20, along with Anderson's final motion for a

continuance. The trial actually began on January 26.

mun upheld a trial result when the plaintiff had asked for 90 days, and then for 60 to 90 days, and was actually given 57 days from the date of trial, and a final request for continuance was denied just before trial.

The only response plaintiff has made in these circumstances is that he could have procured counsel (according to the letter from James F. Finn) had the court been willing to grant another 60 days (presumably from the writing of that letter, dated *10* days before trial and 4 days before a hearing on the final motion for continuance). Thus, in order to escape this court's censure and the reversal of this jury trial, the trial court would have been required to grant a total period of at least 100–plus days from the time the case had initially been set for trial and counsel had withdrawn. I know of no law that would support such a holding.

Despite the apparently "tough" attitude of the district court in attempting to bring this case to a resolution, I simply cannot see that its actions offended either any concept of "fundamental fairness," nor any measure of specific protection to which civil parties are entitled. I therefore respectfully dissent.