**NOT RECOMMENDED FOR PUBLICATION**
File Name: 17a0483n.06

**No. 16-4062**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 17, 2017
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| SCOTT D. GERBER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEPHEN C. VELTRI, | ) | |
| | ) | ON APPEAL FROM THE |
| Defendant-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| and | ) | DISTRICT OF OHIO |
| | ) | |
| OHIO NORTHERN UNIVERSITY; DAVID C. | ) | |
| CRAGO; RICHARD A. BALES; and TONYA | ) | |
| PAUL, | ) | |
| | ) | |
| Defendants. | | |

---

BEFORE: BOGGS, GRIFFIN, and WHITE, Circuit Judges.

GRIFFIN, Circuit Judge.

Plaintiff Scott Gerber appeals a judgment in favor of defendant Stephen Veltri entered following a non-jury trial on Gerber's assault and battery claims.[1] Plaintiff, a law professor at Ohio Northern University's Pettit College of Law (ONU), alleged that defendant, then interim dean, "verbally berated and attacked Mr. Gerber as he grabbed and squeezed Mr. Gerber's shoulder in a tight and strong fashion" during an encounter in the law school hallway. The

---

[1]On the court's own motion, we requested briefing on the question of whether the district court possessed supplemental jurisdiction over these claims. Following our review, we are not convinced the district court erred in exercising jurisdiction.

district court found that Gerber failed to prove that Veltri assaulted or battered him. Because neither finding of fact was clearly erroneous, and plaintiff's claims of error are without merit, we affirm.

I.

On October 8, 2012, plaintiff Gerber had a tense argument with another professor over a student research assistant. She and Gerber both reported the dispute to associate dean Bryan Ward who, in turn, reported it to defendant Veltri. Later, when Veltri saw plaintiff pass by in the hallway, he attempted to stop Gerber so they could discuss the incident.

Defendant put his left non-dominant hand on Gerber's right shoulder, saying, "Scott, we need to talk." He directed Gerber with his other hand toward the nearby faculty lounge. Plaintiff "reacted very suddenly." "Take your hands off me," said Gerber. Veltri did so immediately.

Gerber described Veltri's touch as a "tight and strong" "grab" or "squeeze." Both parties agree that the physical contact was "quick," lasting only "[a]s long as it is to put your hand on someone's shoulder and then saying don't touch me." Defendant admitted Gerber did not expressly consent to being touched on the shoulder, but explained that he "did not touch [plaintiff] in a way that most people in ordinary life would feel offensive." "I think it's implicit when people talk and they put their hand on your shoulder, direct you to a seat, that there's consent." Veltri said he did not intend to harm, offend, or place Gerber in any fear.

Sensing that plaintiff was "strangely offended" by his gesture, Veltri realized meeting with Gerber alone in the faculty lounge, as he initially planned, "was a bad idea." Instead, Veltri asked Ward to join them for a discussion in Veltri's office. There, Veltri asked Gerber about the research assistant issue, while Gerber appeared more concerned with the momentary shoulder squeeze. "You're not allowed to grab me," he told Veltri. Veltri insisted he did not grab Gerber,

and "just touched" plaintiff's shoulder. Plaintiff claimed defendant "continued to berate" him in front of Ward, but Ward denied that either party raised his voice at the other. Both Ward and Veltri testified that Gerber did not mention that defendant hurt him.

Gerber and Ward then retreated to Ward's office, where plaintiff "alleged that Professor Veltri had hit him and asked if he could demonstrate to [Ward] what Professor Veltri had done to him." Ward agreed. He also reenacted Gerber's demonstration before the district court at the bench trial. Ward described it as "an openhanded hit . . . to the shoulder that was certainly not just a tap, but it was not something that was painful at the time." According to Ward, Gerber did not appear to be in any physical pain, but he was upset with Veltri.

Gerber reported the incident to ONU security that afternoon. Security officer Eleanor Laubis assisted plaintiff in completing a complaint form. Gerber also demonstrated the alleged assault and battery for Laubis, this time by grabbing a door knob with a "tight" and "powerful" squeeze. Laubis examined Gerber's arm, but found no signs of bruising or trauma. Nevertheless, she concluded—evidently before speaking with Veltri—that defendant had assaulted him. However, because campus security does not make charging decisions, she recommended that Gerber call the campus conduct hotline or the local police.

Plaintiff alleges his interaction with Veltri caused him "mental anguish" and "emotional distress." A few days after the incident, Gerber contacted Dr. William O'Brien, a psychologist who treated Gerber between 2007 and 2009. O'Brien had no availability to treat patients so he referred plaintiff to a colleague, Dr. Carissa Wott. Wott met with Gerber six times between October 26, 2012, and November 27, 2012. Plaintiff told her he had been "negatively impacted by his work environment," causing him stress, irritability, insomnia, and depression. Wott diagnosed plaintiff with "mixed anxiety and depression" and adjustment disorder, a condition

that causes more intense reactions to stressors "than what we would typically expect . . . . [in] a normal response." Practically speaking, this means Gerber has "more difficulties" dealing with the type of ordinary challenges a "normal or reasonable person would be able to cope with in an everyday life"—including his "conflict with . . . interim Dean [Veltri]." Although Gerber reported his symptoms had been "longstanding," Wott concluded the October 8, 2012, encounter with Veltri aggravated his disorder.

Because she treated plaintiff only after October 8, 2012, Wott explained her evaluation was based solely on Gerber's own description of his symptoms before and after the alleged assault and battery. But Gerber had in fact reported similar difficulties to O'Brien years earlier. Between 2007 and 2009, O'Brien treated Gerber for stress, anxiety, and "negative encounters" with coworkers. Like Wott, O'Brien taught plaintiff "strategies to manage depression and anxiety associated with conflict." Wott acknowledged she formed her opinions without reviewing O'Brien's notes or inquiring about Gerber's past treatment.

Apart from emotional trauma, Gerber alleges he suffered physical injury to his right shoulder. He first sought treatment with orthopedic surgeon Dr. Michael Muha on October 18, 2013—more than a year after his run-in with Veltri, and ten days after he filed suit in state court. Muha diagnosed Gerber with a "partial thickness rotator cuff tear" and "possibly a component of a labrum tear." The tear, Muha explained, was not the result of Veltri's shoulder squeeze, but a preexisting degenerative condition dating back to Gerber's law school days as a softball player. Defendant's expert, orthopedic surgeon Dr. Robert Anderson, concurred with Muha's assessment, agreeing the shoulder grab plaintiff described could not have caused the rotator cuff tear.

Still, Muha concluded it was "reasonable" to think that Veltri's touching of Gerber's shoulder could have "exacerbated or provoked" pain related to the preexisting injury. Gerber did not demonstrate Veltri's "grab" for Muha, as he had done with other witnesses. Muha instead relied on Gerber's self-reported "history," and his complaint that his shoulder "was acutely aggravated by this event on a certain day."

Anderson, by contrast, had reviewed a videotaped deposition of plaintiff demonstrating Veltri's shoulder grab. He concluded the grab could not have caused, or exacerbated the pain associated with a rotator cuff tear. At most, he surmised it "could temporarily exacerbate a previously underlying condition, but not to the extent of a year, or three years following that grab." Anderson and Muha also agreed that Gerber, an avid golfer and weight lifter, could have exacerbated his rotator cuff injury during regular physical activity.

## II.

On October 8, 2013—the last day of the one-year limitations period for intentional torts—Gerber filed suit against ONU, Veltri, and a number of ONU employees in Ohio state court. *See* Ohio Rev. Code § 2305.111(B). Plaintiff's amended complaint and its attachments "exceed[ed] 200 pages and collect[ed] more than seven years' worth of workplace grievances. Gerber claims he has been bullied, lied to, retaliated against, and wrongly denied more than one hundred thousand dollars in retirement benefits" in violation of the Employee Retirement Income Security Act.

ONU removed the case to federal court based on federal question jurisdiction. The district court dismissed plaintiff's claims against the University on the pleadings and at summary judgment, leaving only the assault and battery allegations against Veltri for trial.

On November 18, 2015, the district court settled on January 26, 2016, as the date of trial—about two months earlier than contemplated in the original scheduling order. By this time, the district court had also granted a request from Gerber's counsel (his third in the action) to withdraw from the case.[2] Although Gerber "expressed some reluctance" about moving forward without counsel, the district court emphasized that it chose an earlier trial date because Gerber "would have a couple weeks off" in late January, and the 26th "worked very well on [plaintiff's] calendar." Even so, Gerber moved for a continuance. The district court denied the motion, but added that if Gerber was able to secure new counsel, it would be "happy to consider any request by the lawyer to continue the trial date."

Trial began as scheduled on January 26, 2016, but ended the next day when Gerber's fourth attorney, Thomas Pigott, unexpectedly fell ill. Anticipating that Pigott would recover, the district court scheduled two potential continuation dates: one in April and one in May. Pigott, however, decided he was not well enough to represent Gerber at either. He moved to withdraw as Gerber's counsel on March 21, 2016—43 days ahead of the potential May 3, 2016, trial start date. Pigott also requested the district court grant Gerber a sixty-day continuance to find another attorney. Gerber opposed the motion to withdraw and, for a litany of reasons, orally moved for the district judge to recuse himself from the case.

The district court denied Gerber's motion and granted Pigott's, but declined to afford Gerber the sixty-day continuance. The court simply did not "believe 60 days is necessary," but assured plaintiff that it would entertain a written request for a continuance from his next attorney.

---

[2]Gerber fired the first two attorneys who represented him in state court. The district court granted his third attorney's request to withdraw after he and Gerber disagreed over witnesses and summary judgment arguments.

Gerber moved the district court to reconsider its continuance decision on April 6, but the court denied the motion, confirming May 3, 2016, as the date to resume trial.

Gerber did not secure new counsel and completed the bench trial *pro se*. At the conclusion of the trial, the district court found that Gerber failed to prove that Veltri assaulted or battered him. *See Gerber v. Veltri*, 203 F. Supp. 3d 846, 852–54 (N.D. Ohio 2016). Plaintiff now appeals the district court's judgment.

### III.

Gerber first claims the district court "committed reversible error" in denying his request for a continuance made after Pigott withdrew from the case. Although the district court enjoys "a great deal of latitude" in scheduling matters, *Morris v. Slappy*, 461 U.S. 1, 11 (1983), plaintiff characterizes this "error" as something more than a mere abuse of discretion. *See Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 738 (6th Cir. 2000). In failing to grant him time to find another attorney, Gerber contends the district court violated his rights to counsel and a fair trial. *See Anderson v. Sheppard*, 856 F.2d 741, 747 (6th Cir. 1988).

However, "not every denial of a request for more time . . . violates due process," even if the party seeking a stay "is compelled to defend without counsel." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). "The denial of a . . . motion for a continuance amounts to a constitutional violation only if there is an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Franklin v. Bradshaw*, 695 F.3d 439, 452 (6th Cir. 2012) (citation omitted). No "mechanical test[]" determines whether the district court crossed this line. *Ungar*, 376 U.S. at 589. "The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Id.*

Here, claiming that the district court acted arbitrarily, Gerber compares his case to *Anderson v. Sheppard*. Anderson, an African-American employee of Ford Motor Company, alleged that Ford laid him off and refused to recall him in retaliation for an earlier discrimination complaint. 856 F.2d at 742. At the close of the first jury trial, the district court granted Ford's motion for a directed verdict on the plaintiff's Title VII and 42 U.S.C. § 1981 claims. We reversed, finding that "there were factual disputes that should have been resolved by the jury." *Id.* On remand, Anderson's attorney withdrew from the case, and he obtained new counsel. Before re-trying the case, Anderson and Ford attempted to negotiate a settlement, with the district court acting as mediator. Negotiations failed, and the court scheduled the matter for a second trial. However, "*two days before the scheduled trial date*," the district court allowed Anderson's replacement counsel to withdraw. *Id.* She, like Anderson's first attorney, had advised Anderson to accept Ford's offered settlement. Anderson declined. *Id.* Hearing this, the district court questioned plaintiff:

> The Court: What makes you think you are ever going to find a lawyer that will carry this case forward the way you want it? *If two competent lawyers, one of whom even got a victory for you in the Court of Appeals, after I threw the case out, put egg on my face—I'm not mad[]. . . about it. You're going to have to end up trying this case yourself with no help from anyone.* You know what they say about a plaintiff that has himself for a client? Do you think you can try this case in front of a jury by yourself?
>
> Mr. Anderson: I don't know.
>
> * * *
>
> The Court: What makes you think that you can do any better than her? You've already gotten two lawyers. I'm not going to give you—if she wants to withdraw I'm going to let her. I don't force lawyers to stay in a case. . . . *If I had my druthers I would start the trial of this case tomorrow morning, but I can't because I have another case I'm trying.*
>
> Mr. Anderson: Well, I would like at least twenty-five days.

-8-

> The Court: *If I let her go I'm going to tell* [the clerk] *to put this case on the call, and whenever she finds a date in time to set it for trial* we will bring you in . . . and we will go ahead and retry the case like the Court of Appeals told me to. You may win. You may not. *The odds are against you, you know that, don't you?*

This colloquy continued at length with the district court judge admonishing Anderson for rejecting the settlement offer, and warning him that a jury would likely "sen[d] [him] down the tube." *Id.* at 743 (emphasis omitted). "*You're gambling here*," he told Anderson, "*you don't take that settlement, it's a straight crap shoot for you*." *Id.* at 744. The district court instructed the clerk to schedule the case for trial "at the earliest trial date" available, and made clear that any new counsel will not be given "any additional time to prepare other than the date set for trial." *Id.* (emphasis omitted).

In the three weeks that followed, Anderson attempted, but failed, to find replacement counsel. On the first day of trial, Anderson moved for additional time, and presented a letter from an attorney who agreed to represent him if the court granted a sixty-day continuance. *Id.* Again, the district court denied the motion, forcing Anderson to conduct the jury trial *pro se*. *Id.* at 744–45. The jury returned a verdict in favor of Ford on both claims. *Id.* at 745.

When Anderson appealed the judgment a second time, we reversed. Our holding was two-fold: First, we found the district court judge improperly abandoned his post as a "dispassionate and impartial" arbiter, and, "from all outward appearances, assumed the posture of an advocate" hostile to Anderson. *See id.* at 745–47 ("[T]he district court was hostile toward Anderson because this court had reversed the district court, and, in the words of the district judge, 'put egg on [his] face.' . . . Moreover, the district court . . . had clearly determined that Anderson should settle on the terms offered by Ford."). Second, we held the district court abused its discretion in failing to grant Anderson "a reasonable time" to obtain new counsel—particularly in view of the complexity of the case, the court's preemptive promise to proceed "at

the earliest trial date" with no further continuance, and the lack of any "reasonable justification" for the denial. *Id.* at 748–49.

Gerber's case does not resemble either holding. Plaintiff is right in one respect; "[b]ecause of the fundamental need for judicial neutrality," the harmless error doctrine "is inapplicable in cases where judicial bias and/or hostility is found to have been exhibited at any stage of a judicial proceeding." *Id.* at 746–47. But in the present case, the district court did not exhibit "judicial bias and/or hostility" at any stage of the proceeding.

Cases following *Anderson* typically recount lengthy, tense exchanges between litigants and the district court because a judge's on-the-record statements are evidence of his failure to "preserve[] both the appearance and reality of fairness." *Id.* at 746 (citation and emphases omitted). *See e.g.*, *Dixon v. Fed. Express Corp.*, 33 F. App'x 157, 160–65 (6th Cir. 2002) (per curiam); *see also Nationwide Mut. Fire Ins. v. Ford Motor Co.*, 174 F.3d 801, 805–09 (6th Cir. 1999), *overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009) (en banc). A due process argument under *Anderson* thus "requires that hostility and bias be clear and open and that the bias be evident on the record." *Wheeler v. Southland Corp.*, 875 F.2d 1246, 1252 (6th Cir. 1989) (citing *Anderson*, 856 F.2d at 747).

But Gerber does not point to any inflammatory comments or bias evident on the record. Instead, he would have this court infer bias from the district court's decisions to deny his several requests for a stay, without rebutting the reasons for its decisions. Gerber first moved for a continuance on December 8, 2015, after the district court permitted his third attorney to withdraw and scheduled trial for January 26, 2016—a date the court chose in part to accommodate Gerber's class schedule. During a phone status conference on December 18, the district court gave its reasons for denying the motion. "[A]t this point," it explained, "what we

have left in this case for trial is an assault and battery claim between two individuals," and "so it is my expectation, especially with a bench trial, that this matter will take one day or less for trial." In other words, unlike *Anderson*, this case did not involve a "complex" civil rights action against an institutional defendant like ONU. *See* 856 F.2d at 748. Also different from *Anderson*, it did not involve a jury trial. "And also with a bench trial," the district court planned to be "much more lenient with respect to Mr. Gerber acting pro se," even though he was legally trained, making it "easier for him since he will not have to worry about jury protocol and that sort of thing."[3]

Yet another difference between *Anderson* and the present case is that the district court did not preemptively foreclose the possibility of a continuance in the event that Gerber did find another attorney. To the contrary, the court told plaintiff it was "happy to consider any request" by substitute counsel "to continue the trial date" once he or she entered an appearance. It made this point explicit at the December 18 status conference and repeated this refrain each time Gerber renewed his motion. Gerber maintains that these assurances must be discounted, because when Pigott appeared on his behalf and requested a continuance at a January 11, 2016, phone status conference, the district court denied the motion. But even there, the court gave a reasoned

---

[3]And the district court was more lenient. It accepted "considerable testimony and received a myriad of exhibits that bore little (if any) relation to whether an assault and battery occurred on October 8, 2012." *Gerber*, 203 F. Supp. 3d at 848. "These topics include—but are not limited to—the awarding of an annual honorary chair by a faculty committee, ONU's grievance process, review of ONU by the American Bar Association and the Occupational Health and Safety Administration, allegations of faculty members, other than Veltri, bullying Gerber, and ONU's internal investigation of the alleged assault and battery in the weeks following [the incident]." *Id.* The district court's indulgence of Gerber implicates still another distinguishing fact; Gerber is an attorney. As such, he was better equipped to manage his own representation than the "waste treatment operator" plaintiff in *Anderson*. *See* 856 F.2d at 749 n.3. Thus, if we reviewed for abuse of discretion and considered whether Gerber "suffered any actual prejudice as a result of the denial," we would find none. *Associated Gen. Contractors*, 214 F.3d at 738 (citation omitted).

response for its decision: The court "indicated that [it] would entertain a formal motion if [plaintiff] provided reasons for it. And [the court] never got a formal motion."

The reason the district court requested a definitive written motion is evident from the record. The case set for trial involved only two parties and concerned assault and battery only; extensive discovery had been completed; and Pigott had been on the case since December 22. Further, any replacement counsel would have the advantage of reviewing defendant's testimony ahead of time, as Pigott had questioned Veltri on the first day of trial. Finally, the fact that Gerber, who is a lawyer, ultimately defended himself is not itself sufficient to demonstrate a denial of his right to a fair trial. *Ungar*, 376 U.S. at 589.

For these reasons, the district court's decision to deny plaintiff a continuance was not an abuse of discretion or a violation of the right to due process.

IV.

Next, Gerber challenges Judge Zouhary's rejection of Gerber's "several motions" to recuse himself. We review the denial of a recusal motion for abuse of discretion. *Bell v. Johnson*, 404 F.3d 997, 1004 (6th Cir. 2005) (citing *Youn v. Track, Inc.*, 324 F.3d 409, 422 (6th Cir. 2003)). "We must have a 'definite and firm conviction that the trial court committed a clear error of judgment' before reversing under the abuse of discretion standard." *Youn*, 324 F.3d at 422 (citation omitted).

"To state a due process claim that a judge was biased," Gerber "must show either that actual bias existed, or that an appearance of bias created a conclusive presumption of actual bias." *Lewis v. Robinson*, 67 F. App'x 914, 922–23 (6th Cir. 2003) (quoting *United States v. Lowe*, 106 F.3d 1498, 1504 (10th Cir. 1997)). Plaintiff's bias complaints are founded primarily upon the district court's substantive decisions, including its rulings on his motions for a

continuance, for summary judgment, and the admission of certain evidence.[4] None of them evince improper bias.

*Settlement Conference.* Plaintiff contends that during the February 2015 settlement conference (more than a year before the bench trial), Judge Zouhary "vigorously pressed Gerber to resign his tenured faculty position" in return for the Judge's "assist[ance]" in obtaining a monetary settlement from ONU. Gerber cites no record evidence to substantiate this claim. Again, "*Anderson* requires that hostility and bias be clear and open and that the bias be evident on the record." *Wheeler*, 875 F.2d at 1252. Gerber has not made this showing.[5]

*Motion for Summary Judgment.* Next, Gerber argues that the district court wrongfully refused to consider his motion for summary judgment on the assault and battery claims. The court explained that it did so because the cut-off date for dispositive motions had expired months earlier, and Gerber "did not request to file a summary judgment motion" before the cut-off date. Plaintiff maintains Judge Zouhary never instructed the parties to seek leave before filing dispositive motions. But plaintiff is mistaken. The district court specified in a standing order that "[n]o dispositive motions shall be filed without leave of [the] Court."[6] Gerber may have

---

[4]Veltri counters that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion" pursuant to the Supreme Court's decision in *Liteky v. United States*, 510 U.S. 540, 555 (1994). But *Liteky* examined bias in the context of a motion for recusal under 28 U.S.C. § 455. *See id.* at 543. Due-process based motions for recusal under *Anderson* are a different animal. "*Anderson* . . . did not involve section 455, but was an appeal based on a claim that the actions of the district court had deprived the plaintiff of his right to a fair trial in a fair tribunal." *Wheeler*, 875 F.2d at 1252. Thus "the *Anderson* court reversed and remanded without having to consider the critical factor in section 455 review—whether the bias stems from an extrajudicial source." *Id.* Accordingly, we address each of Gerber's arguments on their merits.

[5]Gerber also believes the district court denied his requests for a continuance due to its hostility against him. For the reasons stated in Section III, he is incorrect.
  [6]*See* Standing Order regarding "Case Management Conference Notice/Report of Parties," available on the website of the District Court for the Northern District of Ohio, http://www.ohnd.uscourts.gov/home/judges/judge-jack-zouhary/.

presented his case *pro se*, but he does not dispute that he, like any other litigant, is bound to follow Judge Zouhary's standing orders.

*Waiver of Right to Jury Trial.* Plaintiff maintains the district court's "decision to advance the trial date from March to January, while simultaneously denying [his] motion for a continuance to obtain substitute counsel," compelled him to waive his demand for a trial by jury. The record belies his claim. In the same motion, Gerber sought a continuance and withdrew his jury demand. And the district court denied the former request and granted the latter at the same hearing. Plaintiff's decision to forego a jury trial thus *preceded* the court's ruling against his request for more time. Judge Zouhary's alleged "unwillingness to permit [plaintiff] the time needed to secure substitute counsel" cannot have influenced Gerber to withdraw his jury request when Gerber withdrew that request *before* the Judge expressed any such "unwillingness."

*Ex Parte Communication.* Gerber next accuses Judge Zouhary of engaging in an improper ex parte conversation with defense counsel immediately after Pigott fell ill on the second day of trial. Their discussion concerned when, and how, the court should reschedule the appearance of witnesses slated to testify that day, particularly defendant's expert Dr. Anderson. Plaintiff argues that Canon 3(A)(4)(b) of the Code of Conduct for United States Judges prohibits such communication. It does not.[7] But even if it did, this fact is irrelevant; the Code of Conduct for United States Judges does not establish grounds for disqualification under the Due Process Clause. *See Railey v. Webb*, 540 F.3d 393, 415 (6th Cir. 2008).

---

[7]When circumstances require it, Canon 3(A)(4)(b) "permit[s] ex parte communication for scheduling, administrative, or emergency purposes," but only "if the ex parte communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication." Judge Zouhary's discussion with defense counsel was for these limited, administrative purposes. What is more, plaintiff identifies no advantage that defendant received as a result of the communication.

*During the Trial*. Lastly, Gerber argues the district court "went too far" when it admitted certain evidence against him. He provides only two examples: first, by admitting testimony concerning Gerber's history as a litigious employee; and second, by questioning Human Resources Director Tonya Paul about Gerber's interactions with her "many years prior to the assault and battery." Plaintiff does not explain how, from an evidentiary standpoint, either decision was improper. But from a bias standpoint, the district court's decisions evince no antagonism against Gerber. If anything, the court appears to have admitted this evidence to offset the expansive testimony plaintiff offered about *Veltri's* behavior "many years prior to the assault and battery."

For instance, Gerber questioned a practicing attorney who graduated from ONU about whether, and to what extent, Veltri yelled at him or other classmates when he was a law student years earlier; he questioned Veltri about a dispute he and plaintiff had at a staff meeting in 2007, five years before the alleged assault and battery; and he questioned a faculty secretary about an instance in which Veltri "got very upset" with her at an unspecified time "quite a while" before October 8, 2012. The district court was, in its own words, "overly generous" with the evidence it allowed plaintiff to present about Veltri's years-old interactions with others. Viewing the record as a whole, its admission of similar evidence against Gerber is more suggestive of an effort to level the playing field than of bias.

In sum, Gerber's claims of judicial hostility are unsubstantiated; he has not demonstrated that the district judge abused his discretion in declining to recuse himself from the case.

V.

Finally, plaintiff contends the district court clearly erred in finding that Veltri did not assault or batter him. We disagree.

"Following a bench trial, we review a district court's factual findings for clear error and its legal conclusions de novo." *Calloway v. Caraco Pharm. Labs., Ltd.*, 800 F.3d 244, 251 (6th Cir. 2015). The scope of clear-error review is "narrow." *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 (6th Cir. 2008). "Under that standard . . . we affirm the court's finding so long as it is 'plausible'" and reverse "only when 'left with the definite and firm conviction that a mistake has been committed.'" *Cooper v. Harris*, 137 S. Ct. 1455, 1474 (2017) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985)).

Ohio defines assault as "the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact." *Stafford v. Columbus Bonding Ctr.*, 896 N.E.2d 191, 200 (Ohio Ct. App. 2008) (per curiam). It defines battery as "an intentional contact with another that is harmful or offensive." *Id.* (citing *Love v. City of Port Clinton*, 524 N.E.2d 166, 167 (Ohio 1988)). To be "offensive," the contact must be the type "which is offensive to a reasonable sense of personal dignity." *Love*, 524 N.E.2d at 167 (citing Restatement (Second) of Torts, § 19 at 35 (Am. Law Inst. 1965)). Intent is an essential element of both torts. "To prove assault and battery under Ohio law, a plaintiff must establish that the defendant unlawfully touched him/her with the intent of inflicting injury or at least creating fear of injury." *Tarver v. Calex Corp.*, 708 N.E.2d 1041, 1051 (Ohio Ct. App. 1998).

A.

Regarding the assault claim, the district court found that Gerber failed to establish that Veltri acted with the requisite intent. Plaintiff testified that once Veltri made contact with his

shoulder, he "thought [Veltri] was going to punch" him, but "the record is devoid of evidence that Veltri intended for Gerber to apprehend anything of the sort." *See Gerber*, 203 F. Supp. 3d at 854. Gerber argues this factual finding was clearly erroneous. He points to evidence the district court allegedly "ignored" (specifically, testimony from others concerning their interactions with Veltri), "edited" (testimony concerning Gerber's physical and psychological injuries), or "rewrote" (Veltri's conflicting statements about how quickly he ran into Gerber in the hallway that morning). None of it speaks to whether Veltri intended to place Gerber "in fear of [offensive] contact." *Stafford*, 896 N.E.2d at 200.

The district court credited Veltri's testimony that he did not intend to put Gerber in fear of offensive contact because "the record corroborate[d] [Veltri's] account." *Gerber*, 203 F. Supp. 3d at 854. As the court explained:

> [After placing his left hand on Gerber's shoulder, Veltri] took no "definitive act" from which this Court could infer he intended Gerber to apprehend a harmful or offensive contact. He made no sudden movement toward Gerber. He did not bring his free right hand toward Gerber; in fact, he gestured away, toward the faculty lounge. He did not say anything to Gerber suggesting he intended to physically harm Gerber.

*Id.* (citation omitted). These undisputed facts convinced the district court that Veltri's account was more believable than Gerber's, and an outcome dependent upon the trial court's credibility determination is not clearly erroneous. *See* Fed. R. Civ. P. 52(a)(6) ("[T]he reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.").

"[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson*, 470 U.S. at 575. If a finding is plausible in light of the full record, that finding "must govern," even if we would have decided the matter differently in the first

instance. *Cooper*, 137 S. Ct. at 1465 (citing *Anderson*, 470 U.S. at 573–74). Here, the district court's factual finding that Veltri did not intend to place Gerber in apprehension of offensive contact is more than plausible. Accordingly, it did not clearly err in finding that defendant did not assault plaintiff.

B.

Intent also came into play in the district court's resolution of Gerber's battery claim, even though "the kind of intent required for battery is an open question in Ohio." *Gerber*, 203 F. Supp. 3d at 852. Some panels of the Ohio Court of Appeals require what the district court referred to as "dual intent," *see id.*, meaning that the defendant must act both with the intent to make physical contact, and with the intent that the contact offend or cause bodily harm to the plaintiff. *See Tarver*, 708 N.E.2d at 1051. Others require only "single intent"—i.e., the intent to make physical contact. *See Feeney v. Eshack*, 718 N.E.2d 462, 464 (Ohio Ct. App. 1998) ("[I]t is not necessary to intend the harmful result; it is sufficient to intend the offensive contact that causes the injury."). The Ohio Supreme Court's position on this issue is not clear. *See Love*, 524 N.E.2d at 167 ("A person is subject to liability for battery when he acts intending to cause a harmful or offensive contact, and when a harmful contact results.").

As expected, plaintiff advocates for the single-intent approach. Yet even there, the district court concluded Gerber's claim failed "because he has not satisfied the remaining element of battery: namely, that the contact be harmful or offensive." *Gerber*, 203 F. Supp. 3d at 852. Its finding was not clearly erroneous.

Regarding harm, the district court had good reason to conclude Gerber's "complaints of pain [were] belied by the record." *Id.* at 853. Gerber did not complain of pain to Veltri or Ward immediately after the incident. When Security Officer Laubis examined his shoulder that same

day, she detected no sign of bruising or other trauma. Gerber did not seek treatment with Dr. Muha until more than a year after the incident—and then only after he filed suit against Veltri in state court. Muha found it plausible that Gerber's preexisting rotator cuff injury was exacerbated by defendant's touch, but he acknowledged he formed his opinion based solely on Gerber's report that his shoulder "was acutely aggravated by this event on a certain day." He, unlike Dr. Anderson, never witnessed Gerber demonstrate the shoulder grab and relied solely on Gerber's word. "In light of the other record evidence," the district court found that "Gerber's word fails to carry his burden to show Veltri's touch caused physical injury." *Id.* Such a credibility determination can "virtually never be clear error." *Anderson*, 470 U.S. at 575.

Gerber counters that in concluding he did not demonstrate harm, the district court misinterpreted Ohio law, which does not require proof of an actual physical injury to sustain an action for battery. Plaintiff is right; physical injury is not a uniform prerequisite since "the conduct complained of must be [either] harmful *or* offensive." *Tarver*, 708 N.E.2d at 1051 (emphasis added). But the district court found that Gerber also failed to make the alternate showing: that Veltri's touch would be offensive to a reasonable sense of personal dignity. *See Love*, 524 N.E.2d at 167 ("Conduct which is offensive to a reasonable sense of personal dignity is offensive contact.").

This too was not clearly erroneous. For one, even if Veltri knew that any physical contact was likely to offend plaintiff, as plaintiff believes he must have, the district court had reason to question whether the offense Gerber experienced was actually attributable to Veltri's contact. Dr. Wott opined that plaintiff's encounter with Veltri aggravated his anxiety and depression. But because she began treating plaintiff only after October 8, 2012, Wott "had no benchmark for determining the effect the incident had on Gerber's preexisting psyche" apart

from Gerber's own assessment. *Gerber*, 203 F. Supp. 3d at 853. Gerber's other emotional-distress witnesses, Father David Young and former ONU law professor Bruce French, likewise did not detect a noticeable change in Gerber's demeanor after the alleged assault and battery.

For another, Gerber does not have a *reasonable* sense of personal dignity. Wott testified that he experiences "more difficulties" dealing with the challenges a "normal or reasonable person would be able to cope with in an everyday life," including conflict with coworkers. But "[i]n order that a contact be offensive to a reasonable sense of personal dignity, it must be one which would offend the ordinary person and as such one not unduly sensitive as to his personal dignity. It must, therefore, be a contact which is unwarranted by the social usages prevalent at the time and place at which it is inflicted." Restatement (Second) of Torts § 19 cmt. a; *see also Love*, 524 N.E.2d at 167 (relying on the Restatement). Touching a colleague on the shoulder to get his attention is well within the ordinary "social usages prevalent" in the workplace. Insofar as Veltri's touch caused plaintiff emotional distress, it is because plaintiff "take[s] things more personally than usual," not because defendant's conduct was "offensive to a reasonable sense of personal dignity." *Love*, 524 N.E.2d at 167. Therefore, the district court's finding that defendant did not batter plaintiff was not clearly erroneous.

On the whole, we are not left with "the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573 (citation omitted). We therefore conclude the district court did not clearly err in finding that Veltri did not assault or batter Gerber.

VI.

For the foregoing reasons, we affirm the district court's judgment.